Fee Paid

FILED
CLERK, U.S. DISTRICT COURT

**4/6/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DD_____ DEPUTY

No CV-30

1  CHRIS BAKER, State Bar No. 181557
2  cbaker@bakerlp.com
   MIKE CURTIS, State Bar No. 252392
3  mcurtis@bakerlp.com
4  BAKER CURTIS & SCHWARTZ, P.C.
   1 California Street, Suite 1250
5  San Francisco, CA 94111
6  Telephone: (415) 433-1064
   Fax:  (415) 366-2525
7
8  Attorney for Relator
   ALEX BALEKIAN, M.D.
9

10
11             UNITED STATES DISTRICT COURT
12             CENTRAL DISTRICT OF CALIFORNIA
13

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX BALEKIAN, M.D. and THE STATE OF CALIFORNIA, *ex rel.*, ALEX BALEKIAN, M.D.,<br><br>                         Plaintiffs,<br><br>      vs.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA and USC CARE MEDICAL GROUP, INC.,<br><br>                         Defendants. | Case No.2:20-cv-03176-ODW(JPRx)<br><br>**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT, CALIFORNIA FALSE CLAIMS ACT, AND CALIFORNIA INSURANCE FRAUDS PREVENTION ACT**<br><br>**DEMAND FOR A JURY TRIAL** |

14
15
16
17
18
19
20
21
22

23       <u>**[FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)]**</u>

24
25
26

RECEIVED
CLERK, U.S. DISTRICT COURT

**4/3/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DD_____ DEPUTY

27
28

COMPLAINT AGAINST USC

**INTRODUCTION**

1.     For years, Plaintiff and Relator Alex Balekian, M.D., raised complaints concerning the University of Southern California's (USC's) fraudulent billing of critical care medical services to Medicare, Medi-Cal and private insurers. Despite clear knowledge of the fraud (both before Balekian's complaints and after), USC's fraudulent conduct continued.  Among other things, USC sought to finance an unprecedented expansion of its medical enterprise, and every extra dollar counted.

2.     More specifically, and according to USC's alumni office (in an article for its Trojan Family magazine),[1] in 2009, USC purchased two private hospitals, the 401-bed Keck Hospital of USC and the 60-bed USC Norris Comprehensive Cancer Center) for $280 million.  In 2013, it added the USC Verdugo Hills Hospital.  And in 2015, USC "pulled 520 of its doctors from 19 different practices into a unified university medical group practice."  As a result, over 40% of USC's overall budget was related to medicine and health.  USC had "no choice but to make these investments" because it sought to remain a top research university.

3.     This expansion, of course, had to be paid for, and "[w]ith dramatic changes in the health care landscape underway, the nation's academic medical centers are seeing their profit margins perilously whittled down."  Accordingly, USC was motivated to generate revenue in every way possible.

4.     Unfortunately, and as detailed below, this has included the systemic generation and submittal of false claims to both the government and private insurers.  The false claims provided USC with a way to increase its revenue from the particularly important source of patient care.  As the USC article further explained: "across the nation, revenue from patient care in academic medical

---

[1] https://news.usc.edu/trojan-family/usc-stakes-its-future-on-medicine/

centers like USC's is critical to universities because they underwrite some of the costs of educating medical students and conducting research."

5.      Astonishingly, from 2011 to 2015, "Keck Medicine's revenues more than doubled, making it a $1.2 billion operation." According to their most recently reported numbers, Keck Hospital of USC and the USC Norris Comprehensive Cancer Center had annual total patient revenue of over 4.2 billion dollars. Some significant portion of this revenue arose from false claims. Namely, and as alleged here, throughout the applicable limitations periods, USC has been improperly "upcoding" services provided by physicians to recover lucrative critical care reimbursements throughout its intensive care units (ICUs). USC has also sought double reimbursement for the same service, particularly by improperly billing both the attending physician and nurse practitioner for critical care provided to patients admitted to its ICUs. These acts violate the federal and California False Claims Acts, in addition to the Insurance Frauds Prevention Act ("IFPA"), Cal. Ins. Code § 1871.7. On information and belief, USC has also submitted false claims for reimbursement of critical care purportedly provided at its Verdugo Hills Hospital and other locations. As a result of these fraudulent schemes, USC has submitted millions of dollars' worth of false claims.

6.      The sheer number of claims that pass through Medicare and the other insurers each year makes it virtually impossible to catch medical providers who upcode or double bill. Medicare auditors, for instance, were limited to reviewing just two percent of any institution's claims throughout most of the relevant period for this lawsuit, and the audit cap was lowered in recent years to just 0.5 percent for most institutions. Unlawful billing is therefore usually only revealed through the reporting of the fraud by beneficiaries or medical professionals with direct knowledge of the illegal practices. Governments and private insurers depend on whistleblowers to protect them. Dr. Balekian has filed this lawsuit to do so. This is

1   a *qui tam* action that seeks appropriate remedies on behalf of the United States and

2   the State of California for this illegal conduct.

3                    **PARTIES AND JURISDICTION**

4        7.      Plaintiff and Relator Alex Balekian, M.D., was an Assistant Professor

5   of Clinical Medicine at USC from 2009 through January 2019 in the Pulmonary

6   Division.   Dr. Balekian earned his medical degree from University of California,

7   San Diego. He then went on to complete his Masters in Health Services at UCLA

8   School of Public Health. Dr. Balekian completed his fellowship in

9   Pulmonary/Critical Care at the UCLA David Geffen School of Medicine.  During

10  the relevant period, Dr. Balekian was primarily assigned as an attending physician

11  in the ICUs at USC Norris Comprehensive Cancer Center and Keck Hospital of

12  USC, but would also perform consulting services elsewhere in USC's hospitals and

13  work in USC's clinics.  Dr. Balekian continues to work as a physician and resides

14  in the Central District of California.

15       8.      Dr. Balekian has independent knowledge of, and is the original source

16  of, the information upon which this complaint is based, unless stated otherwise.  He

17  has insider knowledge of USC's fraud.  He voluntarily provided this information to

18  the United States Attorneys' Office before filing this action, and is serving upon the

19  Department of Justice, the U.S. Attorney for the Central District of California, and

20  the California Attorney General, a "disclosure statement" containing substantially

21  all the evidence in his possession about the allegations set forth in this complaint.

22  Dr. Balekian is also providing to the Los Angeles District Attorney and the

23  Insurance Commissioner of California a full disclosure of substantially all material

24  facts, as required by Cal. Ins. Code § 1871.7(e)(2).

25       9.      Defendant USC's principal place of business, including its Keck

26  Hospital of USC, Keck School of Medicine, the USC Norris Comprehensive

27  Cancer Center, and the USC Verdugo Hills Hospital, is in the Central District of

28

California.  As a private corporation, USC is governed by the Board of Trustees of The University of Southern California.

10.    Defendant USC Care Medical Group, Inc., is a medical group practice of around 600 physicians who are on the faculty of the Keck School of Medicine of USC and staff USC's hospitals and other healthcare facilities.  Defendants USC and USC Care Medical Group, Inc. are collectively referred to in this complaint as USC.

11.    Since at least 2013, USC, by and through its physicians, non-physician practitioners, officers, employees, and agents, have submitted a multitude of false claims to Medicare, Medi-Cal and private insurers.  These acts also occurred in this jurisdiction.

12.    Jurisdiction is proper because this case raises federal questions under the federal False Claims Act.  *See* 28 U.S.C. § 1331; 31 U.S.C. §3730; 31 U.S.C. §3732(a); 42 U.S.C. §1320a-7b.   Jurisdiction is also established for the California False Claim Act claim under 31 U.S.C. §3732(b).

## BACKGROUND FACTS

13.    USC defrauded both private insurers and government programs.  Based on Dr. Balekian's experience (including his involvement in USC's reviews of the length of patient stays) between 30 and 40 percent of USC's patients are covered by Medicare, with the remainder divided between Medicaid (including Medi-Cal) and private insurers.

14.    Two of the government programs at issue here are Medicare, the federal health insurance program for the elderly and the disabled, (42 U.S.C. §§ 1395 *et seq.*), and Medicaid, the federal/state health insurance program for the needy, medically-needy, aged, blind, and disabled and families with dependent children. (42 U.S.C. §§ 1396 *et seq.*)  California's Medicaid Program is called "Medi-Cal." (Cal. Welf. & Inst. Code §§ 14000 *et seq.*)

15.     The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A and the Supplementary Medical Insurance Program established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395, *et seq.*, which are known respectively as Medicare Part A and Medicare Part B.  USC's Medicare reimbursements under Part B are at-issue in this lawsuit, which cover physicians' and non-physician practitioners' ("NPP") medical services.

16.     The government provides reimbursement for Medicare claims from the Medicare Trust Funds through the Center for Medicare & Medicaid Services ("CMS"), which is the operating division of the HHS.  CMS contracts out to Medicare Administrative Contractors to review, approve, and pay submitted Medicare claims.  Medi-Cal claims are processed by the Medicaid Management Information System ("MMIS") Fiscal Intermediary, which is a vendor with which the California Department of Health Care Services ("DHCS") contracts.

17.     Medicare, Medi-Cal and private insurers typically pay for physician and NPP services based on a specific and detailed fee schedule. In establishing the fee schedule, there is a comprehensive system of coding for services established by the American Medical Association.  The Current Procedural Terminology ("CPT") codes describe thousands of services using five digit codes, each with different reimbursement rates.

18.     In addition to CPT codes, practitioners also identify a diagnosis code with each request for reimbursement.  The International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) is the current document setting forth the codes for diagnoses.  CMS provides an accompaniment document titled "ICD-10-CM Official Guidelines for Coding and Reporting," which it describes as the "set of rules" for ICD-10 codes.  These ICD Guidelines direct health care providers to "[c]ode all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care treatment or management."  Both

the principal diagnosis, which is supposed to be sequenced first, and other diagnoses are to be coded.  The principal diagnosis is supposed to be "that condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."  Other diagnoses are "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or the length of stay."  In sum, the diagnoses billed reveal the patient's overall condition, but little about the care actually provided for which reimbursement is sought.

19.   Each time a health care provider submits a claim (whether electronically or otherwise), the healthcare provider makes certain certifications about the information set forth in the claim, including with respect to the CPT and diagnosis codes.  One certification, submitted with each claim, is that all the information on the claim is "true, accurate, and complete." As detailed below, this certification is knowingly false with respect to USC's critical care claims.

### CRITICAL CARE BILLING AT USC'S ICUs

20.   The Medicare Claims Processing Manual, CMS Manual System Pub 100-04, Chapter 12, titled "Physicians/Nonphysician Practitioners," section 30.6.12, sets forth the requirements to bill CPT codes 99291 or 99292 for critical care.  Critical care is defined as "the direct delivery by a physician(s) medical care for a critically ill or critically injured patient. A critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition."

21.   Unsurprisingly, critical care services are reimbursed at a much higher rate than non-critical care services.  Accordingly, health care providers have a substantial motivation to bill services as critical care, even when they do not meet the specific requirements to do so.

22.   "Critical care is a time-based service, and for each date and encounter entry, the physician's progress note(s) shall document the total time that critical

care services were provided." (Emphasis supplied.) "Progress notes" means the practitioner's notes in the patient's medical records, which are the best record of the patient's condition and care received.

23.    USC operates an ICU at the Norris Cancer Hospital and six ICUs at Keck Hospital. The ICU at Norris has approximately seven beds. The bed count for the Keck ICUs is approximately 64.

24.    USC maintains and implements at least two different schemes by which it submits false claims with respect to patients in its ICUs: An upcoding scheme and a double billing scheme.

25.    Dr. Balekian has direct knowledge of both the upcoding scheme and the double-billing scheme. As a long-time ICU physician, he observed the care provided, and he reviewed electronic medical records (including medical bills) that evidence the schemes. He also repeatedly complained about USC's false billing practices. In addition to direct complaints to practitioners about their billing practices, Dr. Balekian complained about the double billing at the monthly faculty meetings he was able to attend from approximately 2015 through 2018. These meetings were attended by his superiors, including Dr. Zea Borok, Chief of the Division of Pulmonary and Critical Care Medicine, and Ian Quiza, Senior Clinical Administrator, Division of Pulmonary and Critical Care Medicine, in addition to other administrators. Despite these complaints, the schemes continued.

26.    USC maintains guidelines that forbid the schemes set forth below but, based on information and belief, USC has knowledge of the schemes through its monitoring processes. USC is fully aware that, by virtue of these schemes, it is systematically submitting false claims to the government and insurers. Despite this knowledge, USC continues in its unlawful course of conduct, and actively encourages its providers to falsely code treatment and time. Among other things, USC maintains detailed records of the revenue generated by each doctor or nurse practitioner and discusses this revenue openly. On information and belief,

1  individual compensation is tied to revenue.  And, as detailed below, spreadsheets
2  are regularly sent out to entire divisions encouraging them to bill for time and
3  services that should not be billed.

4  ## DEFENDANTS' UPCODING SCHEMES

5      27.    The first manner by which USC fraudulently billed claims is by having
6  physicians bill CPT code 99291 (or 99292 for longer periods of care) for supposed
7  critical care when they provide services to a patient who is admitted to an ICU, but
8  who does not actually require or receive critical care.

9      28.    As the CMS Manual explains, "medical care to a critically ill, injured,
10 or post-operative patient qualifies as a critical care service only if both the illness or
11 injury and the treatment being provided meet the [critical care] requirements."  The
12 manual continues: "Critical care services must be medically necessary and
13 reasonable. Services provided that do not meet critical care services or services
14 provided for a patient who is not critically ill or injured in accordance with the
15 above definitions and criteria but who happens to be in a critical care, intensive
16 care, or other specialized care unit should be reported using another appropriate
17 E/M code (e.g., subsequent hospital care, CPT codes 99231 - 99233)."  (Emphasis
18 supplied.)   CMS communicates "change requests" in Medicare payment policy to
19 the Medicare Administrative Contractors (the groups that administer the Medicare
20 reimbursements) through "transmittals."[2]  Transmittal 1548, July 9, 2008, further
21 clarifies that if multiple providers are billing critical care for the same patient,
22 "[c]ontractor shall instruct physicians and qualified NPPs that medical record
23 documentation of each physician (or qualified NPP) shall be used to support
24 medically necessary concurrent critical care services provided and billed by more
25 than one physician or qualified NPP (CMS Manual § 30.6.12 ¶ I)."

26
27

28  ───────────────────
[2] https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/

- 9 -

29.     The upcoding scheme at USC is carried out in at least three distinct ways.

### First Upcoding Scheme
### Billing for Critical Care when
### the Patient is no Longer Receiving Critical Care

30.     The first way USC upcodes in its ICUs is when a provider assigned to the ICU delivers critical care at some point but the patient remains in the ICU after no longer needing critical care (or returns for a follow up) and that provider nevertheless continues to bill the critical care code.

31.     The CMS manual directly forbids billing critical care under these circumstances: critical care "does not include evaluation and management for patients who previously received critical care services."

32.     Nevertheless, and as detailed below, USC commonly, and knowingly, bills non-critical care under critical care codes in these circumstances.

### Second Upcoding Scheme
### Billing for Critical Care When the Patient
### Is in the ICU for Another Purpose

33.     The second way USC upcodes is when the patient is only admitted to the ICU because 1:1 nursing is needed for a treatment that does not constitute critical care.  One example of this is continuous renal replacement therapy (CRRT).  CRRT is an alternative to traditional dialysis, which requires a 1:1 nursing ratio, with a nurse specifically trained for CRRT.  USC's practice is to train its ICU nurses to administer CRRT so patients must be admitted to an ICU to receive CRRT.  Oftentimes, the patients admitted to the ICU for CRRT, or some other care requiring 1:1 nursing, are sitting in bed without oxygen, eating, etc. and not suffering from a "critical illness or injury [that] acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition."

34.　The CMS Manual specifically directs that "[p]atients admitted to a critical care unit for close nursing observation" does not constitute critical care.

35.　Nevertheless, and as detailed below, USC commonly, and knowingly, bills non-critical care under critical care codes in these circumstances.

### Third Upcoding Scheme
### Billing for Critical Care by Providers
### Not Providing Critical Care

36.　The third way USC upcodes is when the regular medical provider for a patient in the ICU delivers care to the patient in the ICU concerning the patient's other conditions, as opposed to a critical care condition.

37.　Per the CMS Manual: "While more than one physician may provide critical care services to a patient during the critical care episode of an illness or injury each physician must be managing one or more critical illness(es) or injury(ies) in whole or in part" to bill for critical care.  For example, the CMS manual explains that when a "dermatologist evaluates and treats a rash on an ICU patient who is maintained on a ventilator and nitroglycerine infusion that are being managed by an intensivist" the dermatologist cannot bill critical care.

38.　Nevertheless, and as detailed below, USC commonly, and knowingly, bills non-critical care under critical care codes in these circumstances.  For example, USC's hematology/oncology doctors deliver non-critical care to their patients related to their cancer while they are located in an ICU, and falsely code it as critical care.  And other doctors deliver non-critical care to their patients for chronic liver conditions while located in an ICU, and falsely code it as critical care.

### DEFENDANTS' DOUBLE BILLING SCHEME

39.　The second manner by which USC fraudulently bills claims is by double billing.  USC has its nurse practitioners bill the 99291 code whenever they enter notes in a patient's chart, even though the attending physician has also billed the 99291 code for that day.  Similarly, on information and belief, in the surgery

- 11 -

1  ICUs, anesthesiologists bill for critical care when their services are duplicative of
2  those otherwise billed for; and surgeons bill critical care for care actually provided
3  by others.

4       40.    Critical care services are designated by CPT code 99291 for the first
5  30 through 74 minutes of critical care given. (Critical care of less than 30 minutes
6  cannot be billed as critical care.) The time requirements for code 99291 "must be
7  met by a single physician or qualified NPP." "Unlike other E/M services where a
8  split/shared service is allowed the critical care service reported shall reflect the
9  evaluation, treatment and management of a patient by an individual physician or
10 qualified non-physician practitioner and shall not be representative of a combined
11 service between a physician and a qualified NPP." CPT code 99292 is used to
12 report additional critical care block(s) of time, up to 30 minutes each, beyond the
13 time on which the 99291 was billed. Unlike code 99291, code 99292 may represent
14 aggregate time of physicians with the same specialty.

15      41.    The CMS Manual explains the impropriety of double billing Code
16 99291, which "should only be used once per calendar date per patient by the same
17 physician or physician group of the same specialty." "More than one physician can
18 provide critical care at another time and be paid if the service meets critical care, is
19 medically necessary and is not duplicative care." Stated another way, "[w]hile
20 more than one physician may provide critical care services to a patient during the
21 critical care episode of an illness or injury each physician must be managing one or
22 more critical illness(es) or injury(ies) in whole or in part" to bill for critical care.
23 (Emphases supplied.) "Physicians of the same specialty within the same group
24 practice bill and are paid as though they were a single physician and would not each
25 report CPT 99291 on the same date of service."

26      42.    Transmittal 1548 makes even clearer through the following change
27 requests that a physician and a NPP, like a nurse practitioner, from the same
28

practice group, cannot both bill for the first 30 to 74 minutes of critical care provided to a patient:

- 5993.16 Contractor shall instruct physicians and qualified NPPs that physicians in the same group practice who have the same specialty shall not each report an initial critical care code 99291 on a given date (CMS Manual §30.6.12 ¶ I).

- 5993.18 Contractor shall instruct physicians and qualified NPPs that a physician or qualified NPP who is providing "staff coverage" or "follow-up" for a clinician (physician or qualified NPP) in the same group who provided the first hour of critical care shall bill CPT code 99292 for critical care services and not CPT code 99291 (CMS Manual §30.6.12 ¶ I).

43.     Beginning in 2013, USC began staffing the Norris ICU with nurse practitioners (NPs). Each patient in the Norris ICU is assigned both an attending physician and a nurse practitioner (NP). Under California law, NPs do not have an additional scope of practice beyond the usual RN scope and must rely on standardized procedures for authorization to provide medical care. 16 California Code of Regulation § 1485. Part of standardized procedures is setting forth the required physician supervision. 16 California Code of Regulation § 1474. Thus, a NP cannot provide medical care, under California law, unless it is done under the type of physicians' supervision designated in the standardized procedure. Accordingly, the CMS Manual requires that critical care services "may be provided by qualified NPPs and reported for payment under the NPP's National Provider Identifier" only when the services are "within the scope of practice and licensure requirements for State in which the qualified NPP practices… Collaboration, physician supervision and billing requirements must also be met."

44.     In USC's ICUs, NPs provide critical care side-by-side with the attending physician. Thus, for example, no NP on one of Dr. Balekian's shifts ever administered care that would constitute critical care without his involvement. And

1  any medical care provided by NPs that would not be duplicative would be outside
2  of their scopes of practice. Yet Dr. Balekian observed NPs on the nightshift billing
3  critical care during the same calendar day even though the medical records state
4  that the patient did not have any new symptoms.  Dr. Balekian expressly directed
5  NPs that they should not bill under code 99291 because it would be duplicative of
6  the care provided by the attending physician.  As mentioned above, he also
7  complained to management at the monthly faculty meetings about this practice,
8  stating that double billing by NPs under code 99291 violated government
9  regulations and was improper.  Nevertheless, his complaints and directions were
10  ignored, and the practice continued.

11      45.    For example, through at least January 2019, there were three NPs
12  assigned to the Norris ICU day shift, one of whom is there each day.  Their initials
13  are RF, CH and SW.  Dr. Balekian's review of electronic health records and billing
14  records for patients treated in the Norris ICU shows that the NPs continued to bill
15  under 99291, despite his direction.  Moreover, according to government records,
16  USC submitted a total of 137 critical care code 99291 requests for reimbursement
17  from Medicare for these NPs for 2016 and 157 requests in 2017.  This practice was
18  prevalent throughout the statute of limitations period.  As detailed above, these
19  claims are false.  NPs cannot truthfully bill under critical care code 99291.  NPs
20  double bill to avoid getting in trouble with USC.

21      46.    One of the ways USC ensures this double billing is its "missing"
22  charges email.  Approximately every two weeks, a Project Specialist in the Keck
23  Department of Medicine sends an email titled "Missing Inpatient Charges" to Mr.
24  Quiza.  The email also cc's the Senior Business Analyst at Keck Medicine and the
25  Vice Chair for Finance and Administration at USC.  The email attaches a
26  spreadsheet showing each instance where a physician or NP in the Pulmonary
27  Division made an entry into a patient's medical chart but the billing office has not
28  received a charge.  They are rolling spreadsheets with between a six-month and

twelve-month lookback, depending on the time of the year. Mr. Quiza then sends a group email, with the spreadsheet attached, to all of the providers in the Division with the direction: "Please submit as soon as possible." The longer the missing charge appears on the spreadsheets the higher the pressure to submit a bill. As the practitioners submit bills, that instance is removed from the spreadsheet so Dr. Balekian was able to see the effectiveness of these emails in pressuring practitioners to submit additional bills. This pressure is added to the pressures to submit false claims that were discussed above.

47. Dr. Balekian complained that instances where another provider already billed for the service should not be put on the spreadsheet. USC would not agree to remove those instances. Instead, it made clear that the providers should bill for the services anyway by specifically adding a column advising the providers that they would not be the only ones billing for this service. Thus, for example, a spreadsheet covering January 1, 2017 through May 4, 2018, identified a total of 198 entries where providers were pressured to bill even though another provider had already billed for the instance. As a result of this pressure, the NPs referenced above eventually submitted bills for services another had already billed for at least 96% of the time.

48. Concerned about the amount of double billing that the pressure of these emails was leading to, Dr. Balekian reviewed numerous of the progress notes in the medical charts and billing entries for ICU patients who appeared on the spreadsheet. Dr. Balekian's review of the patient progress notes confirmed that the NP did not make any entries that could constitute non-duplicative care. These documents prove USC's fraudulent scheme of double billing to increase its profits.

## REPRESENTATIVE EXAMPLES OF FALSE CLAIMS

49. While this complaint alleges two fraudulent billing schemes, they are in fact, often employed at the same time. For example:

1    **Patient 1**

2        50.   Patient 1was treated in the ICU in January 2018 regarding sepsis and

3    an altered mental status. [3]

4        51.   With respect to double-billing by NPs, ICU attending physician RM

5    and nurse practitioner SW both submitted 99291 charges on the patient's first day

6    in the ICU.  RM notes he "saw and examined the patient at the bedside.  Pertinent

7    lab results and imaging studies were reviewed by me.  I agree with fellow's

8    findings and assessment and plan as documented.  CC [meaning "critical care"]

9    time 35 minutes with no overlap."  However, Nurse practitioner SW's notes

10   demonstrate her care overlapped with RM's.  Her notes state: "CC Time 30 mins

11   D/W" [meaning "discussed with"] attending physician RM." [4]

12       52.   With respect to upcoding by providers not providing critical care,

13   hematology physician AM also submitted a 99291 charge for Patient 1 on the

14   patient's first day in the ICU and numerous days thereafter (which was also double

15   billing). However, the progress notes demonstrate this physician was not providing

16   critical care.  The notes also do not state this physician provided any care in excess

17   of 30 minutes, a requirement for billing a charge under 99291.

18       53.   With respect to upcoding for critical care after the patient no longer

19   needs critical care, on a subsequent day in January 2018, both the attending

20   physician and the NP billed under code 99291 (double-billing) even though Patient

21   1 was plainly no longer in need of critical care.  Rather, the progress notes describe

22   the patient as sleeping, with no overt symptoms or concerns, and no acute stress.

23

24   _____

25   [3] Patients are identified by unique identifiers to protect their privacy.  Providers are identified by their initials.

26   [4] These notes are typical of those for the ICU practitioners in the other exemplar

27   patients so they are not re-alleged throughout.  While RM's and SW's minimalistic

28   note leaves much to be desired, this Complaint does not allege 99291 notes like these result in false claims.

54.     Other instances of double-billing and upcoding are evidenced throughout this patient's stay in the ICU.

## Patient 2

55.     Patient 2 (covered by Medicare) has leukemia and was admitted to Norris in September 2017, and then transferred to the ICU in October 2017, when his condition worsened.

56.     With respect to <u>double billing</u>, NPs RF and SW submitted 99291 charges on two days in October 2017, even though the services they provided overlapped with the physicians who <u>also</u> submitted 99291 charges (and the patient did not need critical care in any event).

57.     With respect to <u>upcoding for critical care after the patient no longer needs critical care</u>, also on those same two days in October 2017, ICU physicians CC and AR submitted 99291 charges even though the patient did not receive critical care services.  Rather, the patient was alert, conversant, and on minimal oxygen.

58.     With respect to <u>upcoding for critical care by providers not providing critical care</u>, on two days in October 2017, a hematology physician (PC) submitted 99291 charges even though the patient did not need critical care, the notes show the hematologist did not provide critical care, and the notes do not demonstrate the hematologist spent more than 30 minutes with the patient.

## Patient 3

59.     Patient 3 (covered by Medi-Cal) has lymphoma and was admitted to the ICU for respiratory failure.

60.     With respect to <u>upcoding for critical care after the patient no longer needs critical care</u>, on two days in November and three days in December 2017, ICU attending physicians (AR, SK, and RJ) submitted 99291 charges when their

- 17 -

1   notes clearly demonstrate the non-critical nature of the patient (the patient was alert,
2   conversant, on minimal oxygen).

3       61.    With respect to <u>double-billing</u> on two days in December 2017,
4   NPs (SW and RF) double billed by submitting charges for services that were not
5   distinct from the ICU attending physicians and did not warrant critical care billing.

6

7                                **Patient 4**

8       62.    Patient 4 (covered by Medicare) suffered a cardiac arrest in November
9   2017, but was "okay" three days later per the progress notes.

10      63.    With respect to <u>upcoding for critical care after the patient no longer</u>
11  <u>needs critical care</u>, on two days in November and one day in December 2017, the
12  ICU attending physician (RJ) submitted 99291 charges when the notes clearly
13  demonstrate the non-critical nature of the patient (the patient was alert, conversant,
14  on minimal oxygen).

15      64.    With respect to <u>double-billing,</u> on one day in November and two days
16  in December 2017, the NPs (SW and CH) double billed by submitting 99291
17  charges for services that were not distinct from those of the ICU attending
18  physician.  And, as explained above, even if the services were distinct, the patient's
19  clinical condition did not warrant critical care billing.  On another day in December
20  2017, attending physician RJ correctly billed 99233 for subsequent care, but nurse
21  practitioner SW still billed 99291 for that day, making the request for
22  reimbursement of her charge on that day both double billing and upcoding.

23

24                               **Patient 5**

25      65.    Patient 5 (covered by managed care) has an auto immune disease.

26      66.    With respect to <u>upcoding for critical care after the patient no longer</u>
27  <u>needs critical care</u>, on two days in January 2018, the ICU attending physician (RM)

28

                                    - 18 -

1    submitted 99291 charges even though the notes clearly demonstrate the non-critical

2    nature of the patient (the patient was alert, conversant, on minimal oxygen).

3         67.    With respect to <u>double-billing</u>, on those same dates, the NPs (SW and

4    RF) submitted 99291 charges for services that were not distinct from those of the

5    ICU attending physician.

6         68.    With respect to <u>upcoding by providers not providing critical care</u>, on

7    the first of those days in January 2018, a hematology physician (AM) submitted a

8    99291 charge when her addendum did not summarize the time spent on the

9    patient's care, nor document that the patient needed critical care.

10

11    **Patient 6**

12         69.    Patient 6 (covered by Covered California) has Lymphoma and was

13    admitted to Norris in November 2018, and was subsequently transferred to the ICU.

14    Dr. Balekian cared for Patient 6 while he was the attending physician in the Norris

15    ICU on a day in December 2018, and billed 99233 for 35 minutes of subsequent

16    care because Patient 6 did not need critical care.  The 35 minutes resulted from both

17    Dr. Balekian and nurse practitioner RF, which is appropriate because subsequent

18    services are allowed to be combined by a physician and a NP and billed by the

19    physician.  But, with respect to <u>upcoding for critical care after the patient no longer</u>

20    <u>needs critical care</u>, over the next three days in December 2018, the attending

21    physician in the ICU on those days (RJ) submitted 99291 charges when the

22    progress notes clearly demonstrate the non-critical nature of the patient (the patient

23    was alert, conversant, on no oxygen).  Patient 6 had not gotten any worse on those

24    days.  A normal oxygen saturation is documented on all progress notes.

25         70.    On two of those dates, the NP (SW) also <u>double billed</u> by submitting

26    99291 charges for services that were not distinct from RJ, and the patient's clinical

27    condition did not warrant critical care billing anyways so the SW also <u>upcoded for</u>

28    <u>critical care after the patient no longer needs critical care</u>.

71. Finally, with respect to <u>upcoding by providers not providing critical care</u>, on three dates preceding Dr. Balekian's care in November 2018, a hematology physician (AM) submitted 99291 charges when her progress notes did not state the time spent on the patient's care or what purported critical care was provided.

## Patient 7

72. While admitted to the Norris ICU in 2017, Patient 7 was covered by Medi-Cal.

73. With respect to <u>upcoding for critical care after the patient no longer needs critical care</u>, ICU attending physicians AR, RJ, and SK along with nurse practitioners SW and RF submitted critical care charges on five days in November and three days in December 2017. The patient notes do not support critical care billing.

74. With respect to <u>double-billing</u>, on two days in November 2017 nurse practitioner SW and physician AR double billed non-distinct critical care, on one day in December 2017, nurse practitioner SW and physician RJ double billed non-distinct critical care, on another day in December 2017, nurse practitioner RF and physician SL double billed non-distinct critical care.

## Patient 8

75. While admitted to the Norris ICU in 2017, Patient 8 was covered by Medicare.

76. With respect to <u>upcoding for critical care after the patient no longer needs critical care,</u> ICU attending physician CC improperly submitted critical care charges on two days in October 2017.

77. With respect to <u>upcoding by providers not providing critical care,</u> Hematology physician PC improperly submitted critical care charges on two subsequent days in October 2017.

78.     Patient 8's progress notes demonstrate the non-critical nature of the patient.

## Patient 9

79.     While admitted to the Norris ICU in 2017, Patient 9 was covered by Medicare.

80.     With respect to <u>upcoding for critical care after the patient no longer needs critical care,</u> nurse practitioners CH and SW in addition to ICU attending physician RJ submitted critical care charges on two days in November and two days in December 2017, even though Patient 9's progress notes demonstrate the non-critical nature of the patient.

81.     With respect to <u>double-billing</u>, during those same days in November and December 2017, nurse practitioners CH and SW double billed non-distinct critical care with attending ICU physician RJ.

## Patient 10

82.     Although more could be alleged, the final example of these fraudulent schemes alleged in this Complaint is Patient 10, who was admitted to the Norris ICU for CRRT, but his progress notes plainly reveal a stable patient who is breathing comfortably without any oxygen.

83.     Similar to the pattern of oncologists/hematologists upcoding when they visit their patients while those patients are admitted to the ICU, a hepatologist (BK) billed 99291 for four days in August 2018 even though Patient 10 did not need critical care.  BK's four addenda to the progress notes for each day reinforce that even if Patient 10 needed critical care, BK did not provide it, particularly since each notes exactly the same: "Time spent on ICU care 30min."

84.     BK's billing therefore submitted false claims based on <u>upcoding by providers not providing critical</u> care and <u>care provided to patients admitted to the</u>

1 ICU for something other than critical care. This too is a wide-scale problem of
2 false claims because the liver service often follows their patients to the ICU and
3 bills critical care even though the hepatologists are not providing critical care.

4

**FIRST CAUSE OF ACTION**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**
**(ON BEHALF OF THE UNITED STATES)**

8      85.    Dr. Balekian incorporates paragraphs 1 through 84 of this Complaint
9 as if set forth here.

10     86.    Through the conduct identified above, USC presented or caused to be
11 presented to an agent of the United States claims for payment.

12     87.    The claims were false or fraudulent and USC knew (as defined in 31
13 U.S.C. § 3729(b)(1)) they were false or fraudulent.

14     88.    USC knowingly presented false records and statements, including but
15 not limited to claims, bills, invoices, requests for reimbursement, and records of
16 services, in order to obtain payment or approval of charges for critical care services
17 when the services rendered did not comply with Medicare's statutes, regulations
18 and policy guidance.

19     89.    Moreover, under Medicare Part B: "The benefits provided to an
20 individual by the insurance program established by this part shall consist of …
21 entitlement to have payment made on his behalf… for … services of a nurse
22 practitioner … *but only if no facility or other provider charges or is paid any*
23 *amounts with respect to the furnishing of such services*." 42 USC §
24 1395k(a)(2)(B)(iv) (emphasis supplied). Given this requirement for payment, to the
25 extent that the requests for reimbursement of double billed NP critical care services
26 are not express falsehoods, they are certainly materially false certifications that no
27 other provider is being paid for the same services, especially because this
28 requirement is an express condition for payment. And, any claims for care

- 22 -
COMPLAINT AGAINST USC

provided by NPs that would not be duplicative of their supervising physicians would be outside of their scopes of practice and cause further express and/or implied materially false certifications.

90.    USC's conduct violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing harm to the United States.

91.    As a result of USC's unlawful conduct, the United States is entitled to penalties and damages.

**SECOND CAUSE OF ACTION**
**Federal False Claims Act, Making or Using False Records or Statements**
**Material to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**
**(ON BEHALF OF THE UNITED STATES)**

92.    Dr. Balekian incorporates paragraphs 1 through 91 of this Complaint as if set forth here.

93.    Through the conduct identified above, USC knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

94.    Through the above alleged fraudulent billings schemes, USC knowingly made, used, or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges for critical care services when the services rendered did not comply with Medicare's statutes, regulations and policy guidance.

95.    USC's conduct violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing harm to the United States.

96.    As a result of USC's unlawful conduct, the United States is entitled to penalties and damages.

**THIRD CAUSE OF ACTION**
**Federal False Claims Act, Retention of Proceeds to Which Not Entitled**
**31 U.S.C. § 3729(a)(1)(G)**
**(ON BEHALF OF THE UNITED STATES)**

97.    Dr. Balekian incorporates paragraphs 1 through 96 of this Complaint as if set forth here.

98.    USC also knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

99.    An "obligation" is defined in 31 U.S.C. § 3729(b)(3) as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment."  The Patient Protection and Affordable Care Act of 2010 adds to that definition that any "overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation" under section 3729.  § 1320a–7k(d)(3).  The deadline for reporting and returning the overpayment is "60 days after the date on which the overpayment was identified."  § 1320a–7k(d)(2).  "A person has identified an overpayment when the person has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment. A person should have determined that the person received an overpayment and quantified the amount of the overpayment if the person fails to exercise reasonable diligence and the person in fact received an overpayment."  42 C.F.R. § 401.305.

100.   As discussed above, USC received more money from the Medicare programs than it was entitled to through its schemes of overbilling critical care. USC knew that it had received more money than it was entitled to, as alleged

- 24 -

1    above, and avoided its obligation to return the excess money to the Government.

2    USC should have, through the exercise of reasonable diligence, determined that it

3    received overpayments and quantified the amounts of the overpayments more than

4    60 days ago.

5         101.   USC's conduct violated 31 U.S.C. § 3729(a)(1)(G) and was a

6    substantial factor in causing harm to the United States.

7         102.   As a result of USC's unlawful conduct, the United States is entitled to

8    penalties and damages.

9

10                        **FOURTH CAUSE OF ACTION**
                        **Violation of California False Claims Act**
11                       **California Government Code § 12651(a)**
                        **(ON BEHALF OF THE STATE OF CALIFORNIA)**
12

13        103.   Dr. Balekian incorporates paragraphs 1 through 102 of this Complaint

14   as if set forth here.

15        104.   Through the conduct identified above, USC violated California

16   Government Code § 12651(a)(1).  USC has knowingly (as defined by §

17   12650(b)(3)) presented or caused to be presented false or fraudulent claims for

18   payment or approval with respect to Medi-Cal reimbursements.

19        105.   Through the conduct identified above, USC also violated California

20   Government Code § 12651(a)(2) by knowingly (as defined by § 12650(b)(3))

21   making, using, or causing to be made or used false records or statements material to

22   a false or fraudulent claim with respect to Medi-Cal reimbursements.

23        106.   USC also violated California Government Code § 12651(a)(7) because

24   they knowingly (as defined by § 12650(b)(3)) made, used, or caused to be made or

25   used, a false record or statement material to an obligation to pay or transmit money

26   or property to the Government, or knowingly concealed or knowingly and

27   improperly avoided or decreased an obligation to pay or transmit money or property

28   to the State of California with respect to Medi-Cal reimbursements.

1    107.   For Medi-Cal-qualifying patients, Medi-Cal acts as the co-insurance
2    when the patient is also covered by Medicare. Therefore, when USC conducted
3    their fraudulent schemes to overbill Medicare for critical care, USC also defrauded
4    Medi-Cal in the case of dual coverage patients.

5    108.   USC's conduct was a substantial factor in causing harm to the State of
6    California.

7    109.   As a result of USC's unlawful conduct, the State of California is
8    entitled to penalties and damages.

9

10                          **FIFTH CAUSE OF ACTION**
                        **Violation of the Insurance Frauds**
11                  **Prevention Act, Insurance Code §§ 1871.7**
12              **(On Behalf the State of California and Dr. Balekian)**

13   110.   Dr. Balekian incorporates paragraphs 1 through 109 of this Complaint
14   as if set forth here.

15   111.   "Health insurance fraud is a particular problem for health insurance
16   policyholders.   Although there are no precise figures, it is believed that fraudulent
17   activities account for billions of dollars annually in added health care costs
18   nationally.   Health care fraud causes losses in premium dollars and increases health
19   care costs unnecessarily." Cal. Ins. Code § 1871(h).  USC's critical care billing
20   schemes have fraudulently caused the harm raised by the above statute.

21   112.   Pursuant to Cal. Ins. Code § 1871.7(e)(1), any "interested" person can
22   bring suit on behalf of the State of California for alleged insurance fraud.

23   113.   As alleged above, USC caused to be presented, or knowingly assisted
24   or conspired in presenting or causing to be presented, to insurers in the State of
25   California fraudulent claims in violation of Penal Code § 550(a)(1) and (2), among
26   other provisions.  USC's billing for unwarranted critical care is a false or fraudulent
27   claim for payment of a health care benefit (Penal Code 550(a)(1)) and USC's
28   billing for both the attending physicians' and the NPs' providing of non-distinct

- 26 -

care during a single day constitutes presenting multiple claims for payment of the same health care benefit, in violation of Penal Code 550(a)(2).

114.  USC also violated Penal Code § 550(b)(1), (2) and (3) based on presenting/making the above alleged statements in support of claims for payments pursuant to insurance policies and concealing/failing to disclose events that affect its continued right to insurance benefits and/or payments.

115.  USC knew the critical care bills and related statements were false claims and submitted them with the intent to defraud.

116.  USC's conduct was a substantial factor in causing harm to the State of California.

117.  As a result of USC's unlawful conduct, the State of California is entitled to penalties and damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, by and through the Relator, pray for judgment as follows:

1.    Treble damages;

2.    As to the Fifth Cause of Action, damages sufficient to disgorge USC of unlawful profit and provide restitution for its fraudulent conduct;

3.    Civil penalties;

4.    Attorneys' fees and costs;

5.    Pre and post judgment interest;

6.    Such other and further relief as is equitable and just.

FURTHER, Relator, on his own behalf, prays that:

7.    He receives the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and/or California, including any amounts received from individuals or entities not parties to this action;

8.      Attorneys' fees and costs; and

9.      Such other and further relief as is equitable and just.

Dated: April 1, 2020                    BAKER CURTIS & SCHWARTZ P.C.

By:_____

Chris Baker
Mike Curtis
Attorney for Relator
ALEX BALEKIAN, M.D.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2020                    BAKER CURTIS & SCHWARTZ P.C.

By:_____

Chris Baker
Mike Curtis
Attorney for Relator
ALEX BALEKIAN, M.D.



BAKER CURTIS & SCHWARTZ, PC
1 CALIFORNIA STREET, SUITE 1250
SAN FRANCISCO, CALIFORNIA 94111

TO: U.S. District Court
Central District of California – Western Division
Attention: Clerk of Court (Civil)
255 E. Temple Street, Suite TS-134
Los Angeles, CA 90012-3332



Expected Delivery
04/03/2020